FILED

2015 Jan-28  AM 08:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN FINCH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. CV-13-S-2037-NW** |
| | ) | |
| THE HILLSHIRE BRANDS | ) | |
| COMPANY, HILLSHIRE | ) | |
| BRANDS SEVERANCE PAY | ) | |
| PLAN, and THE HILLSHIRE | ) | |
| BRANDS EMPLOYEE | ) | |
| BENEFITS ADMINISTRATIVE, | ) | |
| COMMITTEE, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Stephen Finch, asserts a single claim for payment of severance benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[1]  He named the following defendants:  (1) his former employer, The Hillshire Brands Company ("the Company"); (2) Hillshire Brands Severance Pay Plan ("the Plan"), an employee welfare benefit plan established by the Company to provide severance benefits to terminated employees; and (3) The Hillshire Brands Company Employee Benefits Administrative Committee ("the

---

[1] Doc. no. 1 (Complaint).

Administrative Committee"), the Plan Administrator.[2]  The case presently is before

the court on cross-motions for summary judgment — one filed by plaintiff, and the

other filed jointly by all defendants.[3]  Upon consideration of the motions, briefs, and

evidentiary submissions, the court concludes that plaintiff's motion should be denied,

and defendants' motion should be granted.

## I. STANDARD OF REVIEW[4]

The Eleventh Circuit has established "a six-step process 'for use in judicially

---

[2] *Id.* ¶¶ 2-4.

[3] Doc. no. 33 (Defendants' Motion for Summary Judgment); doc. no. 35 (Plaintiff's Motion for Summary Judgment).

[4] In ERISA cases, the usual summary judgment standard does not apply.  As the Middle District of Florida explained in an unpublished opinion,

> the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure is incongruent with the ERISA standard of review. *Compare* Fed. R. Civ. P. 56(a) and *Williams*[ *v. BellSouth Telecommunications, Inc.*], 373 F.3d [1132,] 1138[ (11th Cir. 2004); *see also Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002). The Eleventh Circuit charges the district court with determining *de novo* whether the administrator's decision was wrong, *Williams*, 373 F.3d at 1138, rather than whether there is a genuine dispute as to any material fact that requires trial and whether the parties are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a). There may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would. *See Leahy*, 315 F.3d at 17; *see also* this Court's decision in *Crume v. Metro. Life Ins. Co* ., 417 F. Supp. 2d 1258, 1272-73 (M.D. Fla. 2006) (in-depth discussion of interplay between ERISA and summary judgment standards as applied by courts in the Middle District of Florida and elsewhere).

*Pinto v. Aetna Life Insurance Co.*, No. 6:09–cv–01893–Orl–22GJK, 2011 WL 536443, *8 (M.D. Fla. Feb. 15, 2011).  Instead, the motions for summary judgment filed by the parties in this case were merely "the procedural vehicle to bring the case forward for judicial review of the plan administrator's determination."  *Leahy*, 315 F.3d at 18.

reviewing virtually all ERISA-plan benefit denials'": *i.e.,*

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*White v. Coca-Cola Co.*, 542 F.3d 848, 853-54 (11th Cir. 2008) (citing *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004)).

The sixth step of the Eleventh Circuit's formulation was called into question by the Supreme Court in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), where the Court observed that:

> After the Court determined that the administrator of an ERISA plan operated under a conflict, it considered "'how' [a] conflict . . . should

'be taken into account on judicial review of a discretionary benefit determination.'" *Id*. at 2350 (quoting *MetLife v. Glenn*, 552 U.S. 1161, 128 S. Ct. 1117, 169 L. Ed. 2d 845 (2008) (mem.)).   The Court concluded "that a conflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" *Id*. (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 957, 103 L. Ed. 2d 80 (1989) (internal quotation marks omitted)).   The Court explained that the consideration of a conflict as a factor did not require "a change in the *standard* of review" and criticized "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict" that circuit courts had developed.   *Id*. at 2351.   The Court stated that "[b]enefits decisions" are too numerous in nature "to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review.   Indeed, special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress." *Id*.

*White*, 542 F.3d at 854 (alterations and emphasis in original).

Thus, if the court finds a conflict of interest, "the existence of [such] conflict . . . should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious," and "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."  *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008) (alteration and ellipses supplied).

## II. SCOPE OF THE RECORD UNDER REVIEW

Generally, "[r]eview of the plan administrator's denial of benefits is limited to

consideration of the material available to the administrator at the time it made its decision." *Blankenship v. Metropolitan Life Insurance Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Jett v. Blue Cross & Blue Shield of Alabama, Inc*., 890 F.2d 1137, 1140 (11th Cir. 1989)) (alteration supplied).   Here, *in addition to* the administrative record, plaintiff seeks to rely upon: (1) his affidavit;[5] (2) letters from the Company memorializing plaintiff's offer of employment in 2004,[6] and his promotion to Director of Manufacturing in 2006;[7] (3) plaintiff's Performance Plan for Fiscal Year 2012;[8] (4) spreadsheets, Power Point presentations, and photographs plaintiff created to demonstrate his satisfaction of the objectives set forth in his May 2012 Performance Improvement Plan;[9] (5) handwritten notes from plaintiff's meetings with Plant Manager Damon Williams;[10] (6) the transcript of the deposition of Lena Koldras, the Company's Vice-President of Human Resources;[11] (7) an April 4, 2014 newspaper article discussing the closure of the Company's Florence, Alabama plant;[12] (8) the Charter of the Sara Lee Corporation Employee Benefits

---

[5] Plaintiff's Exhibit 1.

[6] Plaintiff's Exhibit 2.

[7] Plaintiff's Exhibit 3.

[8] Plaintiff's Exhibit 4.

[9] Plaintiff's Exhibits 6, 9, 10, 11, 12, 14.

[10] Plaintiff's Exhibits 13, 15.

[11] Plaintiff's Exhibit 7.

[12] Plaintiff's Exhibit 16.

Administrative Committee;[13] (9) a May 29, 2014 e-mail from defendants' attorney to plaintiff's attorney;[14] and (10) a Sara Lee Foods Employee Benefits Enrollment Form.[15]  According to plaintiff, *"where a conflict of interest occurs*, as in the instant case, *and a fair hearing has been denied to a plan participant*, the Court may consider and review materials that go to the heart of the dispositive issues even though outside the technical administrative record."   Doc. no. 40 (Plaintiff's Response to Defendants' Motion for Summary Judgment), at 10 (emphasis supplied).

Plaintiff is correct that some district courts have allowed plaintiffs in ERISA cases to submit evidence that was not part of the administrative record when "the evidence will be used to support a claim of procedural misconduct or bias" by the insurer.  *See, e.g., Bloom v. Hartford Life and Accident Insurance Co.*, 917 F. Supp. 2d 1269, 1278 (S.D. Fla. 2013); *Allen v. Life Insurance Co. of North America,* 267 F.R.D. 407, 412 (N.D. Ga. 2009).  In such cases, however, the evidence must actually relate to the alleged misconduct or bias; the plaintiff cannot obtain discovery related solely to the substantive merits of his claim.  *Bloom,* 917 F. Supp. 2d at 1278.  For example, in *Bloom*, the court allowed the plaintiff to offer evidence regarding whether the insurer followed its own procedures during the claims administration process,

---

[13] Plaintiff's Exhibit 24.  *See also infra,* § II(A), discussing the Company's transition from Sara Lee Corporation to The Hillshire Brands Company.

[14] Plaintiff's Exhibit 25.

[15] Plaintiff's Exhibit 26.

including excerpts from the insurer's claims manual, an internal training guideline,

and the deposition transcript from a representative of the insurer. *Id.* at 1279. Even

so, the court did not allow plaintiff to submit additional medical records that bore on

the ultimate issue of her disability and entitlement to benefits. *Id.*

In addition, in *Adams v. Hartford Life and Accident Insurance Co.*, 589 F.

Supp. 2d 1366 (N.D. Ga. 2008), the district court stated:

> Pursuant [to] the body of case law developed under ERISA, the court,
> at the very least, must examine "the facts as known to the administrator
> at the time the decision [to deny benefits] was made" to determine
> whether the administrator's decision was reasonable. *See Glazer v.
> Reliance Standard Life Insurance Co.*, 524 F.3d 1241, 1246 (11th Cir.
> 2008). "To the extent those 'facts known' are not reflected in the papers
> in the claims file, nothing prohibits Plaintiff from conducting discovery
> as it pertains to [(1) examining whether an administrator fulfilled his or
> her fiduciary duties, (2) whether proper procedures were followed in
> compiling the record; (3) whether the record is complete; and (4)
> whether the administrator had a conflict of interest]." *Lake v. Hartford
> Life & Accident Insurance Co.*, 218 F.R.D. 260, 261 (M.D. Fla. 2003)
> (citing *Cerrito v. Liberty Life Assurance Co. of Boston*, 209 F.R.D. 663,
> 664 (M.D. Fla. 2002)). In addition, if the administrator was acting under
> a conflict of interest when it made the plaintiff's benefit decision, the
> plaintiff has the right to conduct discovery into the surrounding
> circumstances to determine whether such a conflict affected the benefits
> decision. *See Metropolitan Life Insurance Co. v. Glenn*, – U.S. – , – ,
> 128 S. Ct. 2343, 2351, 171 L. Ed. 2d 299 (2008) (noting that the
> significance of an administrator's conflict of interest depends on the
> degree to which the circumstances suggest that the conflict affected the
> benefits decision).

*Adams,* 589 F. Supp. 2d at 1366 (first alteration supplied, all other alterations in

original) (footnote omitted).

Thus, the court will consider the additional evidence submitted by plaintiff, but only to the extent that it relates to determining whether the administrator acted under a conflict of interest when it made plaintiff's benefit decision, and whether plaintiff was provided a fair hearing at the administrative level. Even so, the court will *not* consider any additional evidence that relates solely to the issue of whether plaintiff was, in fact, entitled to severance benefits.

## III.  FACTS

### A.    The Hillshire Brands Company Severance Pay Plan

The Hillshire Brands Company was known as the Sara Lee Corporation until sometime during 2012, when a corporate transition occurred.[16] The Hillshire Brands Company ("Hillshire Brands" or "the Company") adopted the Hillshire Brands Severance Pay Plan ("the Plan") on December 31, 2012, to provide severance benefits to eligible employees whose employment with the Company was involuntarily terminated.[17] Severance benefits were to be awarded, according to a pre-set formula, to "a participant who involuntarily terminates employment with the company for a reason other than for proper cause (as defined below), and who executes and does not

---

[16] Defendants' evidentiary submission, Exhibit A (Declaration of Lena Koldras) ¶¶ 2-3.

[17] *Id.* ¶ 3. On December 31, 2012, after the transition in ownership of the Company, the Sara Lee Corporation Severance Pay Plan was amended to become the Hillshire Brands Severance Pay Plan, and it was adopted by the Hillshire Brands Company. *Id.* ¶¶ 2-3.

revoke a proper release provided by the company . . . ."[18]

> [A] termination for "proper cause" shall include (but shall not be limited to) termination for any willful or grossly negligent breach of the participant's duties as an employee of the company and termination for fraud, embezzlement or any other similar dishonest conduct, violation of the company's rules of conduct or unsatisfactory performance.[19]

The Company maintains "sole discretion to determine whether a termination is for 'proper cause.'"[20]  It also has "discretionary authority to construe and interpret the provisions of the plan and make factual determinations thereunder, including the power to determine the rights or eligibility of employees as participants and the amounts of their benefits under the plan, and to remedy ambiguities, inconsistencies, or omissions."[21]

---

[18] Koldras Declaration, Exhibit 1 (Sara Lee Corporation Severance Pay Plan) § 3.1.  The Plan later restates the requirement that a release be executed:

> No benefits under this plan shall be payable to any participant unless such participant and the company have executed, and not revoked, a separation and release agreement within the time set forth in the separation and release agreement.  In the event the separation and release agreement is not executed within the time set forth in the separation and release agreement, all benefits under this plan shall be forfeited.  The payment of benefits under this plan shall be subject to the terms and conditions of such separation and release agreement, which may contain non-competition and non-solicitation provisions.  The terms and conditions of a participant's separation and release agreement with respect to the payment of severance benefits are incorporated by this reference and form a part of this plan as applied to such participant.

*Id.* § 4.1.

[19] *Id.* § 3.1(c) (alteration supplied).

[20] *Id.*

[21] *Id.* § 7.3.

The Plan includes the following requirements for filing a claim for benefits:

It is not necessary that a participant apply for benefits under the plan. However, if a participant wishes to file a claim for benefits, such claim must be in writing and filed with the company within 90 days after the date such participant should have received such benefits. If a claim is denied, the company will furnish the claimant with written notice of its decision, setting forth the specific reasons for the denial, references to the plan provisions on which the denial is based, additional information necessary to perfect the claim, if any, and a description of the procedure for review of the denial. A claimant may request a review of the denial of a claim for benefits by filing a written application with the company within 60 days after he receives notice of the denial. Such a claimant is entitled to review pertinent plan documents and submit written issues and comments to the company. The company, within a reasonable time after it receives a request for review, will furnish the claimant with written notice of its decision, setting forth the specific reasons for the decision and references to the pertinent plan provisions on which the decision is based. If the claimant subsequently wishes to file a claim against the plan, any legal action must be filed within 90 days after the company's final decision.[22]

The Plan also states the following with regard to its administration by the

Company:

The plan is administered by the company. The company, from time to time, may adopt such rules and regulations as may be necessary or desirable for the proper and efficient administration of the plan and as are consistent with the terms of the plan. The company, from time to time, may also appoint such individuals to act as the company's representatives as the company considers necessary or desirable for the effective administration of the plan. In administering the plan, the company shall have the discretionary authority to construe and interpret the provisions of the plan and make factual determinations thereunder, including the authority to determine the eligibility of employees and the

---

[22] *Id.* § 7.14.

amount of benefits payable under the plan.  Any notice or document required to be given or filed with the company will be properly given or filed if delivered or mailed, by registered mail, postage prepaid, to the company headquarters at its then-current mailing address.[23]

The Company's Board of Directors, by resolution, delegated the authority to serve as Plan Administrator to the Sara Lee Corporation Employee Benefits Administrative Committee, which later became the Hillshire Brands Employee Benefits Administrative Committee ("the Administrative Committee").[24]   The Administrative Committee is comprised of three individuals: (1) the Company's Executive Vice President of Human Resources; (2) the Executive Vice President and Chief Financial Officer; and (3) the General Counsel and Corporate Secretary.[25]  The Administrative Committee was vested with

> discretionary authority to administer each Plan according to its terms, to interpret each Plan, to resolve questions and ambiguities arising under each Plan, to make final and binding decisions on all questions arising under the Plans, and to enforce the terms of the Plans.  In addition, the [Administrative] Committee has the authority to delegate any of its

---

[23] Koldras Declaration, Exhibit 1 (Sara Lee Corporation Severance Pay Plan) § 1.3.

[24] Koldras Declaration, Exhibit 2, at ECF 28-30.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically. *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[25] Koldras Declaration, Exhibit 2, at ECF 31.

authority and responsibility under the Plans in writing to others. The [Administrative] Committee is to act in accordance with the standard of care prescribed by Section 404 of ERISA (including any regulations thereunder). In particular, the [Administrative] Committee is to act solely in the interests of participants and beneficiaries, for the exclusive purpose of providing them with benefits and defraying reasonable expenses of administering the Plans, acting with the care, skill and diligence of a prudent man familiar with such matters.[26]

The Administrative Committee, in fact, delegated the authority to make initial benefit claim decisions under the Plan to "any employee of the Company serving in a Director-level or above position in the Company's Human Resources or Global Benefits group."[27] The Administrative Committee also established an ERISA Appeal Committee ("the Appeal Committee"), which was delegated "the discretionary authority to review appeals of decisions denying benefits under [the Plan] and to render final decisions with respect to such appeals."[28] The Appeal Committee consists of "those individuals appointed from time to time by the Company employee serving as the Executive Vice President, Human Resources."[29] During all times relevant to this litigation, those individuals were Lena Koldras, Chris Haller, Alison Rhoten, Matt Magerko, and Perry Amoo-Mensah, all of whom are employees of the Company. Those individuals did not receive any additional compensation for their

---

[26] *Id.* at ECF 30 (alterations supplied).

[27] *Id.* at ECF 35.

[28] *Id.* (alteration supplied).

[29] *Id.*

service on the Appeal Committee.[30]

## B.      Plaintiff's Employment History With the Company

Plaintiff, Stephen Finch, began working for the Sara Lee Corporation, the predecessor company to Hillshire Brands, on March 1, 2004.[31]  He received a promotion to the position of Director of Manufacturing on April 13, 2006.[32] Throughout his employment, plaintiff had access to view the Plan documents on the Company's internal computer network.[33]  Even so, none of the documents provided to plaintiff that described his employment benefits discussed severance pay.[34] Plaintiff attested that he did not actually receive a copy of the Summary Plan Description until sometime in December of 2012.[35]

Plaintiff received a Performance Improvement Plan ("PIP") on May 15, 2012. The PIP document stated that it was "to be completed by the supervisor of an employee who is not meeting performance expectations after documented discussions and development actions have not led to improvement."[36]  The PIP stated that

---

[30] Koldras Declaration ¶ 8.

[31] Plaintiff's Exhibit 1 (Affidavit of Stephen Finch) ¶ 2.

[32] *Id.* ¶ 3.

[33] Koldras Declaration ¶ 17.

[34] Finch Affidavit ¶ 2.

[35] *Id.* ¶ 13.

[36] Plaintiff's Exhibit 5 (Performance Improvement Plan), at 1 (emphasis in original).  A copy of the Performance Improvement Plan was contained within plaintiff's claim file (*see* Kodras Declaration, Exhibit 3, at ECF 59-87), but that version of the PIP had identifying information

plaintiff had experienced prior problems with: (1) ensuring that the Supervisors and Team Leaders working under him understood the expectations of their roles; (2) autonomously creating impactful improvements to the operation; and (3) focusing on the details or actively analyzing situations to ensure effective outcomes. Plaintiff had received suggestions for improvement during his mid-year and end-of the year reviews in 2011. More recently, during his 2012 mid-year review in approximately February of 2012, it was stated:

> Steve needs to aggressively manage his team to ensure the facility meets the expectations for FY 12. Steve still needs to identify and champion change to help grow the Florence Facility operation group. The Florence Facility needs more initiative from Steve to lead to aggressive improvements. Over 2nd half of FY 12 Steve must drive activities that will create positive change across all value streams under his influence (Sandwich assembly groups, Raw area and Cookers). Steve should evaluate his people and determine what changes could ensure Florence Facility short and long term success. Additionally Steve should drive a Kaizen focused on improving material movement between the operations area and shipping. Several opportunities exist with waste around pallet movement and conveyance that Steve's team and the shipping group could improve on. Steve can significantly impact Florence in a positive manner if he drives for improvement at all times. Steve should not settle for any information given to him. Ask the probing questions to get more from your people. And aggressively investigate for areas of improvement.[37]

A follow-up note from March 30, 2012 stated:

---

redacted. For the sake of clarity, the court has quoted the un-redacted version plaintiff submitted as part of his evidentiary submission.

[37] Plaintiff's Exhibit 5, at 1.

-14-

> During recent one-on-one meetings Steve has been coached on focusing on the details of situations and creating plans to improve the operations.   However he has not significantly changed behavior or performance.  An example of this is implementation of Supervisor/Team Leader expectation communication to impacted associates.  Steve was coached on this on March 30, 2012.  Yet it took urging from me to get Steve to begin implementation which did not occur until May 1, 2012.[38]

Plaintiff's shortcomings had impacted the Company's business by impeding continued improvement, slowing engagement of the workforce, preventing optimization of the operation, and placing associates, facility, corporation, consumers, customers and shareholders at risk.[39]

The PIP set forth five objectives plaintiff would need to achieve in order to demonstrate the level of performance expected of him: *i.e.,* (1) "Execute projects that will reduce carton waste by 20% within each of our RTE departments"; (2) "Execute projects that will significantly reduce inedible by 20% for our 3 highest areas (Hot process, cooker #5 and cooker #6)"; (3) "Hold weekly group meetings to review discipline activities to ensure fairness across departments"; (4) "Steve will hold weekly 'idea generation' group meetings with superintendents to generate projects that support the Florence Facility initiatives involving the areas of safety, food safety, and people engagement"; and (5) "Steve will develop and communicate what his

---

[38] *Id.* at 2.

[39] *Id.*

-15-

expectations are within the operation function as it relates to the Leadership Profile Competencies of Performance and Accountability, Commitment to Change, Positive Energy, and Collaboration."[40]  Plaintiff was advised that "[i]mmediate and sustained improvement around the items referenced in the section above is expected," and he was cautioned that, "[i]f required improvement is not achieved and sustained, disciplinary action up to and including dismissal without severance may occur."[41]

Plaintiff's performance under the PIP was reviewed on the following dates in 2012:  May 30, June 13, June 28, and July 2.  On each of those dates, plaintiff was coached on ways to improve his performance.  Plaintiff met some, but not all, of his performance goals during the review period.[42]  Plaintiff prepared spreadsheets on his office computer to demonstrate his progress in each area, and he shared those spreadsheet with Plant Manager Damon Williams when they met to discuss plaintiff's performance.[43]

Williams sent an e-mail to Human Resources Director Ronald Jones on July 18, 2012, to update Jones on plaintiff's progress under his PIP.  Williams summarized the deficiencies that had been identified in plaintiff's performance, the goals that had

---

[40] *Id.* at 2-4.

[41] *Id.* at 5 (alterations supplied).

[42] *Id.* at 6-7.

[43] Finch Affidavit ¶¶ 6-7.

been set for plaintiff's improvement, and the steps that Williams had taken during the

review period to monitor plaintiff's progress and coach him where needed.  With

regard to the specific goals that were set for plaintiff in his PIP, Williams observed:

- Completion of the spans and layers team leader selection process finally was completed after my involvement.

- Overall carton waste has not improved.

- Inedible improvement projects had not delivered the desired results.

- [Finch] has held weekly group meetings to review discipline activities to ensure fairness across departments.  This action item has improved and I would consider it a good outcome.

- [Finch] has held idea generation meetings to develop projects to improve safety, food safety and people engagement improvements.  Execution of these ideas are slow in development. Of the 35 ideas generated, 7 have been completed.  The completed items are related to safety (consistent exercise procedures) and people issues (mostly level setting supervisors on reward and discipline guidelines).  I would evaluate this as not failing, but also not a significant improvement in speed of implementation.

- After review by me, [Finch] did develop and communicate to the operations group his expectations as it relates to the Leadership Profile Competencies.  This was completed mid-way through the PIP.[44]

Williams acknowledged that he had seen a change in plaintiff's performance,

---

[44] Koldras Declaration, Exhibit 3, at ECF 56 (alterations supplied).  The court could not locate an unredacted version of this e-mail in the court record.

but "the change is not at the level of performance" needed from a Plant Operations Manager.[45]  Williams believed, instead, that a person in that position should be "[a] more independent thinker who can aggressively execute plans in a faster timeline," and should "be able to anticipate obstacles, focus on details and effectively utilize all of his resources to help Florence improve."[46]  Because Williams did not view plaintiff as having those qualities, he recommended that plaintiff's employment be terminated,[47] and that recommendation was carried out on August 3, 2012.[48]

On the date of his termination, plaintiff received a letter from the Company's Human Resources Administrator, informing him of his rights with regard to continuation of health, dental, vision, and life insurance benefits.[49]  The letter did not mention severance benefits, and plaintiff did not receive any other information about severance benefits from the Company.[50]  Following his termination, plaintiff no longer had access to electronic copies of the spreadsheets and Power Point presentations he had generated to demonstrate his progress under his PIP, because

---

[45] *Id.*

[46] *Id.* (alteration supplied).

[47] *Id.*

[48] Koldras Declaration ¶ 10.  It is undisputed that plaintiff had been working for the Company long enough to be entitled to severance benefits, as long as no other exclusions applied.  The amount of benefits that would be due to plaintiff, if he were in fact entitled to receive benefits, also does not seem to be in dispute.

[49] Plaintiff's Exhibit 19.

[50] Finch Affidavit ¶ 12.

those files were stored on his work computer.[51]  He also ceased to have access to the

Company's internal computer network.[52]

## C.      Plaintiff's Request for Severance Benefits and Appeal

Plaintiff first made a request for severance benefits on January 30, 2013, more

than five months after his August 3, 2012 termination.  The request was included in

a letter written by his attorney that stated:

> Stephen Finch ("Steve") has requested that we write to you on his
> behalf concerning severance payments that are due him under the Sara
> Lee Corporation Severance Pay Plan.   To date, he has no
> correspondence from Sara Lee addressing this issue.
>
> Steve was employed by Sara Lee on March 1, 2004 and
> terminated on August 3, 2012.  Steve was a loyal, honest and dedicated
> employee, having been appointed to the position of Manager, Plant
> Operations II on July 1, 2007.   The first instance a Performance
> Improvement Plan was developed for Steve was dated May 15, 2012 and
> yet Steve was terminated within a matter of weeks thereof.  It should be
> noted that this Plan was after a February 17, 2012 mid-year report that
> began — "Steve has had a good start for FY 12.  The facility is on track
> to meet all KPI's and that could not have happened without the
> influence that Steve has had on the operations group."
>
> *We could make a strong case that Steve should not have been
> terminated — certainly not based on job performance.  However, Steve
> has moved on and merely desires to be compensated as he should be.*
> Based on my understanding of the severance plan in place on the date
> of severance, Steve is due two (2) weeks of base pay for each complete
> year of service with Sara Lee, plus four (4) weeks of base pay as being

---

[51] *Id.* ¶ 11.

[52] *Id.* ¶ 12.

an individual between the age of 40 and 49.  By my calculations, the amount due Steve is $42,500.40 (20 weeks x $2,125.02).

Please review Steve's file and respond at your earliest convenience.  Payment should be made to Stephen Finch and mailed to our offices, accompanied by the required company release.  If you have questions or would like to discuss this matter, please contact the undersigned.[53]

Plaintiff's initial request for severance benefits was denied in a March 25, 2013 letter written by Ryan Egan, as Delegate of the Administrative Committee.  The letter stated that plaintiff's claim was "untimely and deniable solely on that basis," because plaintiff did not file the claim within 90 days of the date on which he should have received benefits.[54]  The claim also was denied because Egan determined that plaintiff had been terminated for "proper cause."[55]  In making that determination, Egan relied on the following documentation: (1) the January 30, 2013 letter from plaintiff's attorney; (2) the May 15, 2012 PIP; and (3) Damon Williams's July 18, 2012 e-mail to Ronald Jones.[56]  Finally, Egan informed plaintiff of his right to file an appeal with

---

[53] Plaintiff's Exhibit 20, at 1 (emphasis supplied).  This letter was contained within plaintiff's claim file (*see* Kodras Declaration, Exhibit 3, at ECF 39), but that version of the letter had identifying information redacted.  For the sake of clarity, the court has quoted the un-redacted version plaintiff submitted as part of his evidentiary submission.

[54] Plaintiff's Exhibit 21, at 1.  This letter was contained within plaintiff's claim file (*see* Kodras Declaration, Exhibit 3, at ECF 41-42), but that version of the letter had identifying information redacted.  For the sake of clarity, the court has quoted the un-redacted version plaintiff submitted as part of his evidentiary submission.

[55] Plaintiff's Exhibit 21, at 1-2.

[56] *Id.* at 2.

the Appeal Committee within 60 days, and his right to "receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim for benefits."[57]  Egan did not contact plaintiff to discuss the claim before denying it.[58]

Plaintiff appealed the initial denial of his severance benefits through a May 21, 2013 letter from his attorney to the Appeal Committee.  Addressing the issue of the timeliness of his claim, plaintiff's attorney stated:

> [W]hen is the "date he (the claimant) should have received benefits under the Plan"?  This time frame is not specified in the Summary Plan Description (which is all Mr. Finch has ever been provided a copy of).  The SPD states "After a participant and the Company have executed and not revoked a Company-approved release . . . , benefits will be paid in equal installments . . ."  Presumably, the Company provides the release, which has not been done.  I don't believe Mr. Finch can be held to a deadline that has not been provided to him or specifically defined in the SPD.[59]

Plaintiff's attorney also disputed that plaintiff had been terminated for "proper cause" as a result of poor job performance.  He reiterated that the May 15, 2012 Performance Improvement Plan was the first notice plaintiff had ever received that his performance might be unsatisfactory, and he suggested that "the company initiated

---

[57] *Id.*

[58] Finch Affidavit ¶ 15.

[59] Plaintiff's Exhibit 22, at 1 (bracketed alteration supplied, ellipses in original).  This letter was contained within plaintiff's claim file (*see* Kodras Declaration, Exhibit 3, at ECF 37-38), but that version of the letter had identifying information redacted.  For the sake of clarity, the court has quoted the un-redacted version plaintiff submitted as part of his evidentiary submission.

-21-

the PIP as a first step in a severance plan with the intent of not paying Mr. Finch severance benefits due him for years of loyal service."[60]  According to plaintiff's attorney, the fact that Ryan Egan did not interview plaintiff and, instead, relied solely upon information provided by the Company suggested that his decision was "simply a rubber stamp denial of Mr. Finch's claim without any objective or reasonable review."[61]  Plaintiff's attorney requested "a copy of all documents and records of the company with regard to the employment and employment termination of Mr. Finch."[62]  Finally, plaintiff's attorney submitted the following facts for the record:

> Mr. Finch received an acceptable performance rating for fiscal year 2011 with favorable comments from Damon Williams, Plant Manager.  Further, during the mid-year performance rating on February 9, 2012, Mr. Williams commented:  "You are accomplished and not near accomplished."

> As stated, Mr. Finch, for the first time ever, was placed on a Performance Improvement Plan.  The PIP included specific objectives (as outlined therein).  Mr. Finch expeditiously met the objectives stated in the PIP in the following manner:

> > ▸ Projects were executed which reduced carbon [*sic:* "carton"] waste by greater than 20% within each RTE department by the date of termination.

> > ▸ Projects were executed which educed inedible for the three highest areas (hot process, cooker #5 and cooker #6).  The

---

[60] Plaintiff's Exhibit 22, at 1.

[61] *Id.*

[62] *Id.*

inedible numbers were tracking favorable to baseline and on track to achieve the 20% reduction within 30-45 days following termination.

▸ Weekly meetings were held in which discipline activities were monitored to ensure fairness across departments. These meetings continued up to date of termination.

▸ Weekly "idea generation" group meetings with superintendents had begun. Over 40 projects were identified and 12 projects completed (the remaining projects being actively worked) which improved safety, food safety and people engagements. These meetings were being held weekly up to date of termination.

▸ Mr. Finch's expectations of the operations management group were developed in relations to the Leadership Profile Competencies of Performance and Accountability, Commitment to Change, Positive Energy and Collaboration. Mr. Finch met with each member of the operations management group and communicated these expectations. This objective had been completed prior to termination.

Mr. Finch's job performance supports Mr. Williams['s] finding of "acceptable" performance as communicated to Mr. Finch in September, 2011 and February, 2012. The job performance exhibited by Mr. Finch continued thereafter and up to the date of termination. As is evident, Mr. Finch was progressively active in meeting the objectives of the PIP.[63]

The Company submitted a document entitled "Severance Pay Appeal Response" to the Appeal Committee in response to plaintiff's appeal. That document stated:

---

[63] *Id.* at 2 (alterations supplied).

> [Redacted] has performed at the accomplished level and was viewed as a steady performer over the past five-year period.  In part, [redacted] performance has been directly tied to the performance level of the Florence plant.  As performance expectations were raised it was apparent that [redacted] lacked the drive, sense of urgency, and aggressiveness to perform at a higher level.  The coaching has all been based on filling in [redacted] gaps.  The PIP is replete with information related to having him challenge the status quo and increase the level of accountability within the operations department.   Issues would frequently bubble up but [redacted] either failed to address or elevate them to his supervisor for resolution.[64]

The Severance Pay Appeal Response also discussed plaintiff's level of achievement in each of the five specific performance goals set for him in the PIP.  Plaintiff made some improvements, but he did not meet all of the goals that had been set for him. In summary, the Severance Pay Appeal Response stated, "As we transitioned from Sara Lee to [Hillshire Brands], the performance standards were raised for all [redacted].  [Redacted] was tasked with meeting these new demands and he was unable to do so despite coaching and intervention on the part of the supervisor."[65] The Severance Pay Appeal Response was the only document, other than plaintiff's appeal letter, that the Company provided to the Appeal Committee.  The Company did not provide copies of the spreadsheets and Power Point presentations plaintiff had given to Williams to demonstrate his performance progress in the areas identified in

---

[64] Koldras Declaration, Exhibit 3, at ECF 57 (alterations in original).  The court record does not contain an unredacted version of this document.

[65] *Id.* at ECF 58 (alterations in original).

-24-

his PIP.[66]

The Appeal Committee sent a letter to plaintiff's attorney on August 8, 2013, informing him that plaintiff's appeal had been denied.  The letter enclosed a copy of plaintiff's personnel file, in response to his attorney's request for "a copy of all documents and records of the company with regard to the employment and employment termination of Mr. Finch."  The Appeal Committee affirmed the finding that plaintiff's application for severance benefits was untimely by stating:

> [A]n individual who is eligible for severance benefits under the plan will receive payment beginning as early as the first pay period following his or her termination of employment, provided the individual executes and does not revoke a Company-approved release which is provided to the individual upon termination.  The time period for returning the release is up to 45 days, followed by a period of up to 7 days to revoke, but the payment an individual ultimately receives includes amounts retroactive to their termination date.  In the case of your client, the latest he would have received a severance payment, if eligible, is September 28, 2012. This results in a claim filing deadline of December 27, 2012, more than a month prior to your initial request for benefits dated January 30, 2013. Accordingly, the [Appeal] Committee found the 90-day claim filing deadline highlighted on page 7 of the Summary Plan Description of the Plan (SPD), as previously provided to you, was not met and your client's claim is deniable solely on that basis.[67]

The Appeal Committee also affirmed the Administrative Committee's finding that plaintiff was not entitled to severance benefits because he had been terminated

---

[66] Plaintiff's Exhibit 7 (Deposition of Lena Koldras), at 47-48.

[67] Koldras Declaration, Exhibit 4, at ECF 88 (alterations supplied).

for "proper cause," stating:

> The [Appeal] Committee reviewed all of the information associated with the initial denial of benefits by Mr. Ryan, the information and arguments provided in your letter to the [Appeal] Committee, and a response to your letter prepared by Company management, enclosed for your reference, and applied the terms of the Plan that apply to the request for review.  After reviewing all of this information, the [Appeal] Committee determined that Mr. Finch did not meet performance expectations of management and did not meet all of the individual objectives set forth in the Performance Improvement Plan, and that his employment was terminated by the Company for "proper cause" as described in the Plan. Accordingly, your appeal for severance benefits on behalf of Mr. Finch was denied.[68]

Finally, the letter informed plaintiff of his right to "receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim appeal for benefits."[69]  Plaintiff also was informed that he had exhausted all of his administrative remedies and had the right to bring a civil lawsuit under ERISA.[70]

There were no notes or minutes from the Appeal Committee's meeting.[71] Plaintiff asserts that the Appeal Committee's Charter requires it to maintain minutes of each of its meetings, but the only Charter that is in the court's record is that of the

---

[68] *Id.* at ECF 89 (alterations supplied).

[69] *Id.*

[70] *Id.*

[71] *See* Plaintiff's Exhibit 25.

*Administrative* Committee, not the *Appeal* Comittee.[72]

## III. DISCUSSION

### A.    Full and Fair Review[73]

Plaintiff asserts that he was denied the "full and fair review" of his claims to which he is entitled under the ERISA statute, which provides, in pertinent part, that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).

The ERISA regulations provide more detail about what must occur during a "full and fair review."  A plan administrator must provide the participant with written or electronic notice of an adverse decision within ninety (90) days of receiving the claim.  29 C.F.R. § 2560.503-1(f)(1).

> The notification shall set forth, in a manner calculated to be understood by the claimant—
>
> > (i) The specific reason or reasons for the adverse determination;

---

[72] *See* Plaintiff's Exhibit 24 (Charter of the Sara Lee Corporation Employee Benefits Administrative Committee, dated June 11, 2012), at 5 ("Minutes will be kept to reflect any of the Committee's meetings.").

[73] Although the parties order their arguments in various ways, this court will take the lead from the Eleventh Circuit's opinion in *Glazer v. Reliance Standard Life Insurance Co.*, 524 F.3d 1241 (11th Cir. 2008), which stated:  "We evaluate Glazer's arguments in three parts. First, we consider whether Reliance denied Glazer a 'full and fair review.'  Second, we consider whether the district court applied the correct legal standard.  Third, we consider whether the decision of the plan administrator was 'wrong.'" *Id.* at 1245.

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and]

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review . . . .

29 C.F.R. § 2560.503-1(g)(1)(i)-(iv) (alteration supplied).

In addition:

Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

29 C.F.R. § 2560.503-1(h)(1).  To constitute a "full and fair review," the appeal

procedures must:

(i) Provide claimants at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;

(ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

-28-

(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section; [and]

(iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(i)-(v) (alteration supplied).

Pursuant to subsection (m)(8),

[a] document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information

(i) Was relied upon in making the benefit determination;

(ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;

(iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or

(iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

-29-

29 C.F.R. § 2560.503-1(m)(8) (alteration supplied).

The plan administrator must provide the claimant with a written or electronic decision on his request for review with sixty (60) days of receiving the request.  29 C.F.R. § 2560.503-1(i)(1)(i).  If the decision is adverse to the claimant, the notice must set forth:

> (1) The specific reason or reasons for the adverse determination;
>
> (2) Reference to the specific plan provisions on which the benefit determination is based;
>
> (3) A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section; [and]
>
> (4) A statement describing any voluntary appeal procedures offered by the plan and the claimant's right to obtain the information about such procedures described in paragraph (c)(3)(iv) of this section, and a statement of the claimant's right to bring an action under section 502(a) of the Act . . . .

29 C.F.R. § 2560.503-1(j)(1)-(4) (alteration supplied).

If a plan fails to "establish or follow claims procedures consistent with" the regulations,

> a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the

plan has failed to provide a reasonable claims procedure that would
yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(*l*).

Plaintiff does not dispute that he was given adequate or timely notice of the

decisions against him, or of his rights, at each stage, to seek review of the adverse

decisions.  He also does not dispute that the Administrative Committee and Appeal

Committee considered all of the information he provided to them.  Instead, plaintiff

asserts that the Company failed to provide adequate information *to him* and to the

Appeal Committee.  Specifically, plaintiff asserts that the following are "[e]xamples

of Company action or inaction preventing fair consideration of [his] claim":[74] *i.e.,*

> i) the Company's failure to provide Finch with any records and
> documents pertaining to his employment and termination *prior to the
> Committee reviewing his claim* notwithstanding a written, specific
> request thereof by his attorney . . .; ii) the Company's failure to provide
> Mr. Egan and the Committee with documents clearly indicating that
> Finch was successfully accomplishing the five objectives required of
> him under the PIP, specifically, the documents in possession of Finch's
> supervisor, Damon Williams, including spreadsheets, power point
> presentations, and notes of "one on one" meetings between Williams
> and Finch . . .; iii) inaccurate (or in the best light of the Company,
> incomplete) information and conclusions provided to the Company and
> the Committee by Damon Williams in response to Finch's claim and
> appeal . . .; and, iv) failure on the part of Ryan Egan, as delegate of the
> Committee to impartially investigate Finch's claim, including his failure
> to make any effort to contact Finch and ascertain his perspective or

---

[74] Doc. no. 35-1 (Plaintiff's Dispositive Motion for Summary Judgment With Memorandum
of Law in Support Thereof), at 19 (alterations supplied)

position . . . . [75]

The court disagrees with plaintiff that the Company failed to satisfy the regulatory requirements for conducting a "full and fair review" of his claim.   The first time plaintiff requested any documents from the Company was in his attorney's May 21, 2013, appeal letter, wherein he asked for "a copy of all documents and records of the company with regard to the employment and employment termination of Mr. Finch."[76] The Company undisputedly complied with that request when it produced plaintiff's personnel file with the Appeal Committee's August 8, 2013 decision letter.  Even so, plaintiff complains that he did not receive his personnel file *before* the Appeal Committee made its decision, presumably because he wanted to use information from the file as evidence to support his argument on appeal.   There is nothing in the regulations, however, that would require the Appeal Committee to delay its decision until after plaintiff received a copy of his personnel file.  In fact, the regulations would not even necessarily require the Company to provide the file at all as part of a "full and fair review."   Under the regulations, the Company was only required to provide copies of, or access to, "relevant" documents.   29 C.F.R. § 2560.503-1(h)(2)(iii).   A document is only "relevant" if it was relied upon, or

---

[75] *Id.* at 19-20 (emphasis in original, ellipses supplied).

[76] Plaintiff's Exhibit 22, at 1.

submitted in conjunction with, the original benefits determination. 29 C.F.R. § 2560.503-1(m)(8). There is no indication that the Administrative Committee (through Ryan Egan, its delegate) considered plaintiff's entire personnel file — or any of the spreadsheets, Power Point Presentations, or notes that plaintiff generated to demonstrate his improved performance — during its initial evaluation of plaintiff's benefits claim. Instead, Egan stated that he relied on only three documents: (1) the January 30, 2013 letter from plaintiff's attorney; (2) the May 15, 2012 PIP; and (3) Damon Williams's July 18, 2012 e-mail to Ronald Jones. Plaintiff received copies of all of those documents. No other documents were "relevant" under the regulations, so the Company's failure to produce them to plaintiff during any particular stage of the administrative proceedings did not prevent a "full and fair review" of his claim.

There also is nothing in the regulations that would have required Egan to personally contact plaintiff (or his attorney) to ascertain his position. Plaintiff had ample opportunity to state his position in the letters he submitted to the Administrative Committee and Appeal Committee, and he could have presented an affidavit or other documentation to supplement those letters if he had chosen to do so. In plaintiff's initial application letter, he specifically declined to make arguments about the merits of his termination. In his letter to the Appeal Committee, he made detailed arguments about both the timeliness of his claim and the merits of the

decision to terminate his employment.  He even included much of the same information that was contained in the spreadsheets and Power Point presentations he had created, even if he did not actually have those documents available to him.  The Appeal Committee considered all of the documents plaintiff submitted.  There was no need, and no legal requirement, for plaintiff and Egan to have a one-on-one conversation.

In summary, the court finds that plaintiff received a full and fair review of his claim under the ERISA regulations.

## B.     Was the Appeal Committee's Decision Wrong?

The next step is to determine whether the decision of the Appeal Committee to deny plaintiff's appeal was "wrong," or, in other words, whether the court agrees with the Appeal Committee's decision.  *See White*, 542 F.3d at 853-54.  Plaintiff bears the burden of proving that he was entitled to severance benefits.  *Glazer*, 524 F.3d 1246.

### 1.     Was plaintiff's claim for benefits timely filed?

As an initial matter, this court agrees with the Appeal Committee's decision that plaintiff's claim for benefits was untimely.  Pursuant to the Plan, plaintiff was required to file his claim "within 90 days after the date on which [he] should have

received such benefits."[77]  The Appeal Committee decided that plaintiff should have begun receiving severance benefits no later than September 28, 2012 — the first payday after plaintiff had been terminated, and after both the 45-day period for returning the release and the 7-day revocation period had expired.  Thus, plaintiff's deadline for filing a claim expired 90 days after September 28, or on December 27, 2012.

Plaintiff asserts that, because the Plan provides that benefit payments will be made "in equal installments according to the company's normal payroll schedule and as provided in the separation and release agreement,"[78] a new 90-day period should begin to run *each time* he would have received a severance installment payment, rather than a single 90-day period beginning to run upon the date of the *first* benefit payment.  That, admittedly, is a plausible interpretation of the Plan. Even so, the court concludes that the Company's interpretation of the plan is more reasonable, and agrees with it.  The Plan provides that all severance installment payments must be completed within 24 months of the employee's termination date.[79]  It does not seem likely that the Company intended to allow employees more than two years after their termination dates to file claims for severance benefits.

---

[77] Koldras Declaration, Exhibit 1 (Sara Lee Corporation Severance Pay Plan) § 7.14.

[78] Koldras Declaration, Exhibit 1 (Sara Lee Corporation Severance Pay Plan) § 4.2.

[79] *Id.*

Plaintiff also asserts that he should not have been required to file a claim for benefits within 90 days of his termination date (even considering the additional 45-day period for signing a waiver under the ADEA, and the 7-day period for revoking the waiver) because the Company did not inform him, at the time of his termination, that he would *not* be receiving benefits. There is nothing in the Plan, and no law of which the court is aware, that would require the Company to affirmatively inform every terminated employee whether he will receive severance benefits. Plaintiff admittedly had access to the Plan documents throughout his employment, so he should have known his rights with regard to severance benefits. He was aware that the stated reason for his termination was performance problems, and he should have also known that the Plan provided no severance benefits to employees who are terminated for cause.

Finally, plaintiff asserts that, because he never received the separation and release agreement that normally is provided to severance benefit recipients, he had no way of knowing whether, and when, he should have begun receiving benefits. That argument is circular. Plaintiff did not receive a separation and release agreement because the Company determined that he was terminated "for proper cause" and, therefore, that he was not entitled to receive severance benefits. Only employees who are entitled to receive severance benefits will receive a separation and release

agreement.

In summary, the Appeal Committee's decision that plaintiff's claim was not timely filed was correct.  The Appeal Committee's decision could be affirmed solely on those grounds.  Even so, the court will proceed to analyze whether the substance of the Appeal Committee's decision to deny benefits was correct.

### 2.    Was plaintiff entitled to severance benefits?

The Plan provides severance benefits to participants whose employment with the Company is involuntarily terminated, as long as the termination is not "for proper cause."[80]  A termination is "for proper cause" if, among other things, it is the result of unsatisfactory performance.[81]  The Appeal Committee determined that plaintiff was terminated "for proper cause" because he "did not meet performance expectations of management and did not meet all of the individual objectives set forth in the Performance Improvement Plan."[82]  The court agrees with that decision.

The record reflects that plaintiff began to receive suggestions to improve his performance as early as 2011.  Deficiencies in his performance, most of which centered around his failure to initiate and independently sustain change, were documented in February and March of 2012.  Plaintiff's supervisors saw *some*

---

[80] *Id.* § 3.1.

[81] *Id.* § 3.1(c) (alteration supplied).

[82] Koldras Declaration, Exhibit 4, at ECF 89.

improvement in his performance after the PIP was implemented in May of 2012, but plaintiff admittedly did not meet *all* of the objectives set out in the PIP. Additionally, some of the progress that plaintiff did make occurred only after he was prompted or coached by his supervisors, thereby reflecting continued problems with lack of initiative and independence. Overall, plaintiff's performance did not meet the heightened expectations that were in place for all employees after the corporate transition from Sara Lee to Hillshire Brands. Therefore, the Appeals Committee was correct in determining that plaintiff's employment was terminated for cause.[83]

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, plaintiff's motion for summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED. It is ORDERED that all of plaintiff's claims against all defendants are DISMISSED with

---

[83] This decision is based upon the court's review of *only* the material that was before the Appeal Committee at the time of its decision: *i.e.,* (1) the January 30, 2013 letter from plaintiff's attorney; (2) the May 15, 2012 PIP; (3) Damon Williams's July 18, 2012 e-mail to Ronald Jones; (4) plaintiff's May 21, 2013 appeal letter; and (5) the Company's Severance Pay Appeal Response. *See* Section II, *supra.* The court notes, however, that even the additional material plaintiff attempted to submit to the court does not mandate a different result. In plaintiff's own brief in support of his motion for summary judgment, he repeatedly states that he "*substantially* met" the objectives set forth in the PIP. *See* doc. no. 35-1 (Plaintiff's Dispositive Motion for Summary Judgment with Memorandum of Law in Support Thereof), at 22-23 (emphasis supplied). That is an implicit acknowledgment that he did not *fully* meet those objectives. While plaintiff may have subjectively believed that he should have been allowed to get by with only *partial* satisfaction of his performance goals, or that he should have been given more time to fully achieve those goals, it is clear that the reason for his termination was performance-related, which means that the termination was for "for proper cause," as that term is defined in the Plan.

prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 28th day of January, 2015.

_____
United States District Judge